**BOWLES, Price Administrator, v. INDIANAPOLIS RYS., Inc.**

No. 9010.

Circuit Court of Appeals, Seventh Circuit.

March 1, 1946.

Samuel Mermin, George Moncharsh, Deputy Administrator for Enforcement, Milton Klein, Director, Litigation Division, and Albert J. Rosenthal, Office of Price Administration, all of Washington, D. C., Samuel Weiner, Regional Litigation Atty., of Cleveland, Ohio, and Addison Dowling, District Enforcement Atty., of Indianapolis, Ind., for appellant.

Arthur L. Gilliom, Robert D. Armstrong, Elbert R. Gilliom, Perry E. O'Neal, Patrick J. Smith, Albert M. Campbell, Thompson, O'Neal & Smith, and Gilliom, Armstrong & Gilliom, all of Indianapolis, Ind., for appellees.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

EVANS, Circuit Judge.

The O.P.A. challenges the trial court's denial on January 4, 1946, of its application

for a temporary injunction which sought to prevent the introduction of the September, 1945 schedule of street railway rates ordered by the Public Service Commission of Indiana.

The controversy revolves around a change in fares charged by the Indianapolis street railways. In order to visualize better the respective rates at the varying periods involved, we set them forth in chart form:

tinued to January 21, 1946. The O.P.A. had notice of this hearing, and appeared.

On December 13, the Public Counsellor of Indiana instituted an *emergency proceeding* for reformation of the temporary rates. The proceedings were converted into the Commission's own investigation. The Commission gave the O.P.A. notice of this hearing and it appeared. A two-day hearing was had January 7 and 8, 1946, at

| | Sept. 15, 1942 base date | | | Sept. 5, 1945 temporary rate effective Sept. 15 | | |
|---|---|---|---|---|---|---|
| | cash | token | transfer | cash | token | transfer |
| street car and trackless trolley | 7¢ | 4 for 25¢ | 2¢ ea. transfer | 10¢ | 8 for 55¢ | 2¢ first transfer rest free |
| busses | 10¢ | none | free | 10¢ | 8 for 55¢ | free |

Jan. 9, 1946
emergency rate (effective
Jan. 21)

| | cash | token | transfer |
|---|---|---|---|
| street car and trackless trolley | 10¢ | 4 for 25¢ | 2¢ |
| busses | 10¢ | 4 for 25¢ | 2¢ |

On December 10, 1943, the Commission initiated a proceeding before itself, for the investigation of the Indianapolis street railway rates. No notice of this proceeding was given to the O.P.A.[1]

The Commission entered an order for *temporary fares* on September 5, 1945, effective September 15, 1945, after a hearing covering a period of eighteen months.[2]

Thereafter, on November 30, 1945, the railways petitioned to have the temporary rates made permanent, this proceeding being No. 17782. The Commission set a hearing date of December 17, which was con-

which the O.P.A. adduced evidence. The Commission thereupon promulgated its *Emergency Rates,* above set forth.

Also before us is a motion to dismiss the appeal because moot, in view of the emergency rate order of January 9, 1946 (which cancelled and superseded the Temporary Rates sought to be enjoined), to which later proceeding the O.P.A. was a party.

The basis of the O.P.A. suit is the failure of statutory notice to it before entering an order directing an increase in fares. Appellee denies the right of O.P.A. to a notice because there was to be no "general" in-

[1] Notices of the hearings were published in the local newspapers.

[2] There were ten hearing "dates."

crease in rates such as the statute contemplates, but merely an increase as to some of the customers of the street car system. Appellee also argues that an order has since been entered which is the culmination of a hearing of which O.P.A. did have notice, and at which they appeared. They argue the emergency rate order has supplanted and cancelled the temporary rate order, and so the criticism of the first rate order, disappears.

Appellee also states, and its contention was upheld by the trial court, that there has been no *general* increase in rates, according to the finding of the Commission.

Appellee also contends that injunction is an improper remedy in this case, no irreparable injury having been shown.

Plaintiff, in this suit, seeks to enjoin the rates effective September 15, 1945.

The court refused plaintiff's motion for an injunction. It did not dismiss the suit.

Foremost in importance in the solution of the issues presented are the statutes, the Stabilization Act of 1942, Sec. 1, 50 U.S.C.A.Appendix § 961, and the Regulation pursuant thereto, Sec. 1300.901, Procedural Regulation 11. They are here quoted:

Sec. 1, Stabilization Act, 50 U.S.C.A. Appendix § 961

" * * * Provided, that no common carrier or other public utility shall make any *general increase* in its rates or charges which were in effect on September 15, 1942, unless it *first* gives thirty days notice to the President, or such agency as he may designate, and consents to the *timely* intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase." (Italics ours.)

Sec. 1300.901 of the Regulations:

"§ 1300.901 *Definition.* For the purpose of this Procedural Regulation No. 11, a *general increase in the rates* or charges of a common carrier or other public utilty *is defined as any change* in its rates, fares, classifications, rules, regulations or practices which results in *an increase in the charges for transportation or other public utility service applicable to a class of passengers,* shippers or customers, including increases in wholesale or industrial rates or charges for public utility services, *as distinguished from an increase of rates or charges applicable to a particular customer or transportation service* under special arrangement." (Italics ours.)

Appellee's street railway system comprises three types of vehicles—street cars, trackless trolleys and motor busses. Eighty-four per cent of the traffic was on the street cars and trackless trolleys in 1944, and sixteen per cent, on busses. It is permissible for one passenger to use all three kinds of vehicles in a single trip by utilizing the transfer privilege.

The issues are narrow. First is the question of mootness. Did the rendition of the so-called Emergency Rate Order of the Commission, which cancelled the Temporary Rates (against which the injunction is sought) remove the reason for this appeal? Secondly, if the appeal be not moot, was there fatal error in failing to give the O.P.A. notice of the hearings which led up to the entry of the temporary order. Stated differently, and more precisely, did the price change result in a "general increase" or "an increase in the charges for transportation or other public utility service applicable to a class of passengers, shippers or customers * * * as distinguished from an increase of rates or charges applicable to a particular customer or transportation service under special arrangement" thereby making notice to O.P.A. imperative? The statute and the regulation above set forth must provide our answer to both questions.

Incidental issues are the propriety of injunctive relief either as a statutory remedy or a regular equity remedy. Also involved is the practical aspect of the consequences to ensue if an injunction be permitted to issue in the trial court against an order of the Commission, concededly possessed of power to act in matters involving rates charged by public utilities in Indiana.

*Mootness.* Is there still a controverted, live issue in this case now that the proper body, i. e., the Public Service Commission of Indiana, after an emergency hearing, to which the O.P.A. was a party, announced rates to be effective on January 21, of this year, and cancelled the temporary rates, which were the result of the hearing of which the O.P.A. complains because not given statutory notice thereof?

Appellee argues that the O.P.A. has now received all that the Stabilization Act demands for it. That Act contemplated that public utility rates, fixed by expert bodies (state utility commissions) were to continue to be governed exclusively by those bodies. It intended simply that the O.P.A., an agency created to curb inflation and maintain price levels, should be permitted

to attend hearings (and oppose increases in rates) at which utilities seek to increase their rates. It is evident that the O.P.A. is given the opportunity, on behalf of the public, to present the anti-inflationary objectives which should be considered by the Commission before ordering any rate increase.

The nature of the Emergency Hearing appears best from the order itself and its recitals. Other than the order itself, there is no evidence of the extent of hearing, applications for extension of time, or witnesses presented. The order recites in part:

"On November 30, 1945, (defendant) * * * filed a * * * petition with the * * * Commission * * * requesting that the Commission hold a public hearing on the temporary schedule of rates now in effect, to find and determine the current fair cash value of all the petitioner's property actually used * * * and to determine and fix all other facts necessary to an order fixing just and reasonable rates * * *

" * * * on December 20, 1945, the Commission, having under consideration said petition, the said temporary rates referred to in said petition, the monthly reports filed with the Commission by petitioner showing the earnings of petitioner under said temporary rates, and believing that reasonable grounds existed to justify the holding of a public hearing by the Commission on its own motion to determine if an emergency existed requiring the alteration, amendment or suspension of petitioner's existing rates * * * approved an order * * * directing that a public hearing be held * * * *to determine said question of emergency.*

"Thereafter, on January 7, 1946, a public hearing was held in the Rooms of the Commission * * * and continued to and concluded on January 8, 1946 * * *.

"On and prior to September 14, 1945 (then sets forth schedule of rates charged which are herein referred to as 'base' rates).

"On and *prior to the 5th day of September, 1945* consideration had been given by the Public Service Commission * * * and the petitioner to the desirability of a uniform schedule of rates * * *

"On said 5th day of September, 1945, said petitioner filed a schedule of rates effective September 15, 1945, for a trial period of three months ending December 15,

1945, * * * and until the further order of the Commission (then sets forth the 'Temporary' Schedule of rates) * * *

"The evidence introduced (at the emergency trial) * * * shows that during said trial period beginning September 15, 1945, and ending December 15, 1945, said *petitioner actually received gross revenues in the sum of $141,334.97 in excess of that received during the previous three months' period, while the number of riders and users of said transportation system* * * * *during said period decreased by 222,496.*

"*The evidence further shows that for the ninety-one day trial period * * * the average fare paid per passenger* * * * *(increased) .55314¢ * * *.*

"* * * *a government economist, testified* that the trial rate schedule has resulted in a revenue of approximately $1750.00 per day more to the petitioner than petitioner would have collected * * * under the former rate schedule * * *. Said witness further testified *that transportation costs of the character here under consideration constitutes approximately 2½% of the average living costs and that any increase thereof would be and is inflationary in effect.*

"The evidence further shows that the length of time required to hear all of the evidence, which might be introduced, and considered in the case filed by petitioner * * * would take a minimum of three months during all of which time the passengers and users * * * would be paying said increased revenue * * *.

"All evidence introduced in this cause was uncontradicted, neither the petitioner nor any intervener submitted any evidence nor cross-examined any witness. * * *

"The Commission, having heard the evidence and being duly advised in the premises, now finds: * * * 3. That the (temporary) schedules of rates * * * resulted in a substantial increase in gross revenues to petitioner; * * * 5. That an emergency exists which will result in injury to the business and interests of the people, unless the Commission modify the existing rate schedule of petitioner; (states schedule)

"It is further Ordered that the rate schedule (emergency schedule) * * * remain in full force * * * until a final rate is determined by order of this Commission * * * ."

The order also requires appellee to make monthly·reports to the Commission on revenues and statistics.

The O.P.A.'s bases for discounting the Emergency hearing and order as ground for mootness are that the order recites it was solely to determine the status of an *emergency,* and was not a "full-dress" hearing; its findings must have been partially dependent upon the 18 months' hearing on the temporary rates, of which the O.P.A. received no notice. The O.P.A. also contends that should the appeal be found to be moot, this court should not dismiss because of the great importance of the issue involved.

Had the *Emergency* rate order reduced the *temporary* rate schedule to the base period rate schedule, appellant would have had no grievance. The appearance was to prevent "any general increase." It is true the Emergency order restored some of the old base rates, i. e., token prices on street cars. It even gave more advantageous rates to bus passengers (over base rates and temporary rates) in that they were accorded the privilege of using tokens, of four for a quarter, in place of ten cent cash fare. Bus users had no right to token reductions at the time of the base period. The disadvantages between the base period rate and the Emergency rates are a raise in *cash* price of street car and trackless trolley fare from seven cents to ten cents, and a two cent transfer charge to bus customers, whereas they had theretofore been free.

A three cent rise (7¢ to 10¢) in *cash* fare on street cars and trolleys, is one of real and substantial magnitude, and the new two cent charge for bus transfers is also relatively sizeable.[3]

■ Opportunity to be heard was not granted the O.P.A. in the hearing which culminated in the *temporary* (the Sept. 1945) rates. Notice of hearing should have been given O.P.A.

The raising of rates on street cars and trackless trolleys, two of the three modes of transportation of the system carrying 84% of the total traffic, was a "general increase" of rates as that term is used in the statute, and certainly "an increase * * * to a class of passengers" as that term is used in the Regulation. These street car and trackless· trolley passengers were˙ not "particular customers" or users of "transportation service under special arrangement." They were the bulk of the traffic and their rights were the ones intended to be guarded. However commendable a uniform rate to users of all branches˙ of a street railway system might be, a raise of price to one type of carrier is a "general raise" giving the O.P.A. the right to be heard before an increase is effected. Merely because a raise of rate of all the users would constitute a general increase, does not preclude a raise to the users of two of the three types of the system's modes of transportation from also being "a general increase." The difference in mode of transportation is a sufficient differentiation to constitute such users a "class" and a raise in their rates, a "general increase." For an enlightening and controlling discussion of the phrase "general increase," see Henderson v. Washington M. & A. M. Lines, 77 U.S.App.D.C. 26, 132 F.2d 729, certiorari denied 318 U.S. 779, 63 S.Ct. 854, 87 L.Ed.˙ 1147.

■ Appellee chiefly predicates its charge of mootness on the ground that O.P.A. has in any event now been heard and its statutory right to notice and to be heard has been honored. We would accept this view were it not for the fact the statute used the significant adjective *"timely"* in describing the O.P.A.'s privilege of intervention. By no stretch of the imagination could O.P.A.'s appearance at the Emergency Hearing, over two years after the beginning of the Temporary Rate hearing, be considered a timely one, especially in view of the fact that the increased rates resulting from the hearings had been *in effect* over three months before O.P.A. was notified of the said hearing. The statute expressly provides˙ that the O.P.A. be "first" given notice so that it may appear before the body having jurisdiction "to *consider*" such increase, and also provides that no such increase shall be made unless such notice be given.

The Emergency Order may have been and very probably was predicated in part upon the evidence adduced at the original hearing, at which O.P.A. was˙neither a party nor was it present.

■ *Merits of the Appeal.* We are led to an affirmance by a practical considera-

---

[3] It is argued that single cash fares, even˙ though higher, are inconsequential because of the "4 for 25¢ token" fare provision. Passengers who pay 10¢ for single rides are few compared to those who buy the 4 rides for 25¢.

tion of the issues at stake. The trial court was considering the wisdom of a temporary injunction. Its denial was not accompanied by a dismissal of plaintiff's suit.

In our judgment, a denial of injunction was a sound determination for these reasons: (1) There will shortly be a final determination on the *permanent* rates after *full* hearing at which the O.P.A. is a participant. (2) The Emergency order provides for monthly reports of the appellee's profits and provides that the Emergency rates shall continue in effect "until ordered otherwise" which permits of immediate revision should the appellee's monthly financial reports warrant it. (3) The Public Service Commission of Indiana shows a keen appreciation of its duty to the public and is guarding the rates and maintaining them as low as the operation costs permit. It, on its *own* motion, instituted the Emergency proceedings to reduce the Temporary rates when it realized that the increased rates in the short interim of three months gave to appellee larger profits despite lowered traffic (an increase of $141,334 in revenue for three months, although 222,496 fewer passengers). (4) The Commission had full realization of the relative importance of an increase in rates to the public when it reiterated the testimony of a government economist that street railways fare constituted "2½% of the average living costs and that any increase thereof would be and is inflationary in effect." It stated the evidence in fact showed a .55314¢ increase in the average fare paid per passenger. (5) In the vast majority of cases no grave injury will be done by the continuance in force of the Emergency Rate Schedule, over the base rates, in that all passengers may procure passage *by token* at the rate of four for a quarter and thereby circumvent the three cent *cash increase* in street car and trolley fare. We are, however, cognizant, as the O.P.A. must also be, that in some cases where hardship already exists to a degree that the rider may not have the negligible capital on hand to afford the tokens, he is required to pay a three cent penalty for lack of cash—and that such passenger is probably the one most in need of protection.

We were told that the trial court in denying the injunction did not rest the denial on an exercise of discretion, but rather on his interpretation of the statute, holding that the increase in rates for 84% of the customers did not constitute a "general" increase in rates, or for a particular class of persons.

If he did so, he erred. We do not so read his opinion, however, although he did in part so conclude. On the other hand, he stressed as bases for his denial of the injunction the statutory jurisdiction of the Indiana Commission to fix the rates. He stated, "Its duty is to see that rates are approved that are fair not only to the public that uses the services of the utility, but to the utility as well." He also stated, in speaking of the Temporary rates,

"It must be presumed that the Commission, acting as an administrative body regardless of the personnel comprising that body, acted wisely and justly as it construed the facts in the interest of all concerned. * * *

"While the order of the Commission is not under direct attack, yet it must, in effect, be set aside if the relief sought by plaintiff is granted. The only schedule of rates in existence is that now being charged which was approved by the Commission on September 5. An injunction prohibiting the charging of those rates would, in effect, set aside the only order of the Commission now existing * * *.

" * * * The defendant (the company) had the responsibility of determining for itself whether or not the new schedule was a general increase as provided in the Stabilization Act, and whether notice was necessary. The fact that it believed that such rates were not a general increase and that, therefore, no notice was necessary, and none was given, does not, of itself, make the order of the Commission a nullity or invalid, as plaintiff contends. * * *

"Before an injunction can issue in this case, the plaintiff must prove that the public will suffer irreparable injury * * *. This burden he has not met. No irreparable injury will result to the public or to the United States in its effort to control inflation if the injunction is denied. Plaintiff may pursue the remedy now open to him by intervening in the proceeding pending before the Public Service Commission, if permitted by that body to do so, * * * It is apparent that the Commission's order complained of is only temporary in character, adopted for the purpose of ascertaining the effect thereof as applied to the economic condition immediately following the cessation of hostilities, and it may be that the Commission, in the hearings now sched-

uled before it, will be impressed with evidence which may be presented to it by the plaintiff to such an extent that it will feel that justice requires an adjustment of the rates now in effect."

We are satisfied there is no need for an injunction in the instant case, at this stage of the proceedings. The issuance of an injunction would wipe out all rate schedules. O.P.A. contends the injunction might contain a waiting period until the adjustment of rates. We are already achieving essentially just that, in the hearing on the permanent rates now set for hearing. We have a seemingly alert Commission, flexible enough in action to adjust at quarterly intervals, rates to accord with the Company's income, and a Commission aware of the public viewpoint and economic facts involved. Courts should hesitate to interfere with its administrative processes, now that it has control of the situation and is acting with marked expedition. We do not wish to question or belittle the O.P.A.'s duty or right to participate in such deliberations. The zealous performance of its statutory duties is commendable. We merely are weighing actualities—there must be a rate schedule; the Commission is the best judge of the correct schedule of rates and has complete jurisdiction thereof; its jurisdiction should not be infringed upon; unless where the showing is clear. Finally, the rate schedule now by it promulgated is practically an equivalent of the base period rates, with even some lessening of rates.

The decree is affirmed.

SPARKS, Circuit Judge (concurring in result).

I concur in the result reached in the opinion in this case because I feel that the question here presented is moot.